FRIEDMAN KAPLAN SEILER & ADELMAN LLP
1633 Broadway
New York, New York  10019-6708
Telephone:  (212) 833-1100
Facsimile:  (212) 833-1250
Edward A. Friedman (EF-1995)
William P. Weintraub (WW-2897)
Andrew W. Schilling (AS-7872)
Shira D. Weiner (SW-9219)
Danya S. Reda (DR-3036)

Attorneys for Delphi Corporation,
  DEBTOR AND DEBTOR-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
In re:                                         :
                                               :  Chapter 11
DELPHI CORPORATION,                            :  Case No. 05-44481 (RDD)
                                               :  (Jointly Administered)
                            Debtor.            :
                                               :
                                               :
----------------------------------------------------------- x
DELPHI CORPORATION,                            :
                                               :
                            Plaintiff,         :
                                               :
           - against -                         :
                                               :
APPALOOSA MANAGEMENT L.P., A-D                 :  Adversary Proceeding
ACQUISITION HOLDINGS, LLC, HARBINGER           :  Case No ___-_____
DEL-AUTO INVESTMENT COMPANY, LTD.,             :
PARDUS DPH HOLDING LLC, MERRILL LYNCH,         :
PIERCE, FENNER & SMITH INCORPORATED,           :
GOLDMAN SACHS & CO., HARBINGER CAPITAL         :
PARTNERS MASTER FUND I, LTD., and PARDUS       :
SPECIAL OPPORTUNITIES MASTER FUND L.P.,        :
                                               :
                            Defendants.        :
-----------------------------------------------------------------x
```

600950.13

## COMPLAINT

Plaintiff Delphi Corporation ("Delphi"), by its undersigned attorneys, for its Complaint against Appaloosa Management L.P. ("Appaloosa"), A-D Acquisition Holdings, LLC ("ADAH"), Harbinger Del-Auto Investment Company, Ltd. ("Harbinger Del-Auto"), Pardus DPH Holding LLC ("Pardus DPH Holding"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and Goldman Sachs & Co. ("Goldman," and, collectively with ADAH, Harbinger Del-Auto, Pardus DPH Holding, and Merrill, the "Investors"), and against Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger") and Pardus Special Opportunities Master Fund L.P. ("Pardus," and collectively with Appaloosa and Harbinger, the "Commitment Parties"), alleges upon knowledge as to its own actions and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This is a story of trust and betrayal.  Delphi trusted David Tepper ("Tepper") and his hedge fund, Appaloosa, and planned its emergence from Chapter 11 in reliance on the equity financing they promised.  Tepper assured everyone in this case – including the Statutory Committees, General Motors Corporation ("General Motors" or "GM"), Delphi's labor unions, and the Bankruptcy Court – that Appaloosa could be trusted and would honor its commitments.  This action arises from Appaloosa's betrayal of that trust.

2.      In this lawsuit, Delphi seeks a decree of specific performance compelling the Investors and the Commitment Parties to provide equity financing to Delphi as they committed to do, pursuant to agreements that are essential building blocks of the confirmed First Amended Joint Plan of Reorganization (the "Plan") in these

jointly-administered Chapter 11 proceedings for Delphi and forty-one of its subsidiaries (collectively, the "Debtors").  The Investors, together with UBS Securities LLC ("UBS") which is sued in a separate action, committed to fund up to $2.55 billion as necessary for the consummation of the Plan.  Appaloosa's affiliate, ADAH, itself committed to provide approximately half of the total equity financing – $1.076 billion.

3.      If a final judgment of specific performance is not awarded, Delphi seeks, in the alternative, to recover damages in an amount to be determined at trial for the wrongful termination of the parties' agreements, for other contractual breaches, and for the tortious and fraudulent conduct of Appaloosa.  Under the agreements executed by the defendants, all defendants are jointly and severally liable for the wrongful termination and other breaches.

4.      Defendants' failure to honor their contractual commitments – at the eleventh hour when all other parties were ready, willing and able to close on all financing and other agreements embodied in the Plan – derailed Delphi's progress toward emergence from Chapter 11 in April 2008, and has prevented the consummation of the Plan.  Plaintiff alleges and believes that a judgment of this Court requiring defendants to comply with their obligations is warranted as a matter of law and equity, and necessary for the consummation of the confirmed Plan.

5.      On April 4, 2008, the Debtors were set to emerge from Chapter 11 pursuant to the Plan and the agreements embodied therein, all of which are the product of years of negotiation, accommodation, conflict, litigation and ultimately resolution among Delphi, the Debtors' Statutory Committees, the Debtors' principal labor unions, General Motors, certain claimants in multidistrict ERISA and securities litigation, the Internal

Revenue Service, the Pension Benefit Guaranty Corporation and the defendants.  That

date was the deadline for closing under the Investment Agreement based on the provision

therein granting ADAH the right to terminate if the closing did not occur by March 31,

2008, and ADAH's commitment to the Bankruptcy Court and Delphi that ADAH waived

such right to terminate unless the closing did not occur by April 4, 2008.

        6.        One crucial piece of the intricate and complex arrangements

necessary for the consummation of the Plan is the Equity Purchase and Commitment

Agreement dated as of August 3, 2007 as amended on December 10, 2007 (the

"Investment Agreement" and sometimes referred to as the "EPCA"), pursuant to which

ADAH and the other Investors (and UBS) commit to invest up to $2.55 billion of equity

financing in the reorganized Delphi.  (The commitments of the Investors sued herein

amount to $2.383 billion; the commitment of UBS is $166 million.)  The commitments of

defendants ADAH, Harbinger Del-Auto and Pardus DPH Holding are backed by

Commitment Letter Agreements of their respective parents, defendants Appaloosa,

Harbinger and Pardus, dated December 10, 2007.  The Investment Agreement and the

Commitment Letter Agreements were developed through a process that involved intense

and protracted negotiations among the various parties in these Chapter 11 cases as well as

numerous conferences and hearings with the Court over a period of eighteen months.

Appaloosa, in particular, aggressively pursued for itself, and achieved, a dominant and

critical role in the equity financing necessary for the Debtors' emergence from Chapter

11 pursuant to the Plan — and Delphi and all of its stakeholders relied on Appaloosa's

repeated assurances that it would honor its commitments.

7.    The stakes at the closing scheduled for April 4, 2008, could not have been higher for Debtors, their employees, creditors, and other stakeholders.  The equity financing promised by the Investors and the Commitment Parties was and is essential to the consummation of the Plan.  In light of the complexity and inter-relatedness of all the agreements with lenders, unions, General Motors, government agencies, etc., as well as market conditions, and after having devoted more than a year to reaching agreement with the defendants on all the terms and conditions of their equity investment, there is no possible alternative source of equity financing that could save the Plan.  Indeed, because of the vital importance of the equity financing committed by defendants, the agreements in question do not contain any "outs" for the defendants based on market conditions or like contingencies.  Rather, the defendants are required to honor their commitments, just as Delphi has honored its commitments.

8.    Unfortunately, just hours before the scheduled closing, instead of funding and honoring its obligations, ADAH sent Delphi a written notice purporting to terminate the Investment Agreement.  ADAH asserted in its notice that Delphi had breached the Investment Agreement, entered into agreements for an "Alternate Transaction" and effectuated a "Change of Recommendation" (as those terms are defined in the Investment Agreement).  ADAH claimed that Delphi was obligated to pay an Alternative Transaction Fee of $82,500,000.  In fact, ADAH's assertions were false.  Delphi had not breached the Investment Agreement, had not entered into agreements for an "Alternate Transaction" and had not effectuated a "Change in Recommendation."

9.    Delphi believes that defendants backed out of the transaction simply because they decided they did not like the economics of the deal they had agreed

to, and that they never intended to close if the deal was under water. By their refusal to close on April 4, 2008, defendants breached the binding commitments upon which the consummation of the Plan depended.

10.      Delphi brings this action to enforce the commitments of the Investors and the Commitment Parties – in other words, to require defendants to honor their obligations in accordance with the terms of the parties' written agreements. In particular, Delphi seeks a decree of specific performance as against all the defendants because that equitable remedy is necessary and proper under all of the circumstances of this case, and any legal remedy would be inadequate; in addition, Delphi seeks compensation for damages caused by defendants that have been and will be suffered even if specific performance is awarded. In the alternative, Delphi seeks redress for the substantial damages the Investors and Commitment Parties have inflicted on Delphi, the Debtors, their employees, creditors, and other stakeholders.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b) arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

12.      In the Investment Agreement, the Investors "irrevocably submit to the jurisdiction of, and venue in, the United States Bankruptcy Court for the Southern District of New York and waive any objection based on forum non conveniens." Investment Agreement ¶ 16.

13.     In the Commitment Letter Agreements, the Commitment Parties "irrevocably submit to the jurisdiction of, and venue in, the United States Bankruptcy Court for the Southern District of New York and waive any objection based on <u>forum non conveniens</u>."

14.     In the Plan, which was confirmed by Order of this Court dated January 25, 2008, this Court retained jurisdiction, pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, over all matters arising out of, and related to, Debtors' Chapter 11 cases and the Plan, including for purposes of adjudicating all adversary proceedings commenced pursuant to the Plan, issuing any orders in aid of execution, implementation, or consummation of the Plan, enforcing all orders previously entered by the Bankruptcy Court, and hearing and determining all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement.

## <u>THE PARTIES</u>

15.     Plaintiff Delphi is a leading global supplier of mobile electronics and transportation systems.  Headquartered in Troy, Michigan, Delphi and its subsidiaries have approximately 163,500 employees and operate 152 wholly-owned manufacturing sites in 34 countries.  Delphi supplies products to nearly every major global automotive original equipment manufacturer ("OEM"), including General Motors, Ford Motor Company, Chrysler LLC, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company.

16.     Defendant ADAH is a limited liability company organized under the laws of the State of Delaware with an office located at 26 Main Street, Chatham, New Jersey.  ADAH is an affiliate of defendant Appaloosa and a party to the Investment

Agreement. The amount of ADAH's commitment under the Investment Agreement is $1,076,394,180.91.

17.     Defendant Harbinger Del-Auto is a company organized under the laws of the Cayman Islands with an office located at 555 Madison Avenue, New York, New York. Harbinger Del-Auto is an affiliate of defendant Harbinger and a party to the Investment Agreement. The amount of Harbinger Del-Auto's commitment under the Investment Agreement is $397,225,891.24.

18.     Defendant Pardus DPH Holding is a limited liability company organized under the laws of the State of Delaware with an office located at 590 Madison Avenue, New York, New York. Pardus DPH Holding is an affiliate of defendant Pardus and a party to the Investment Agreement. The amount of Pardus DPH Holding's commitment under the Investment Agreement is $342,655,959.96.

19.     Defendant Merrill is a corporation organized under the laws of the state of Delaware with an office located at 4 World Financial Center, New York, New York. Merrill is a party to the Investment Agreement. The amount of Merrill's commitment under the Investment Agreement is $166,866,749.19.

20.     Defendant Goldman is a limited partnership organized under the laws of the State of New York with an office located at 1 New York Plaza, New York, New York. Goldman is a party to the Investment Agreement. The amount of Goldman's commitment under the Investment Agreement is $166,866,749.19.

21.     The total commitment of the Investors under the Investment Agreement is $2,383,142,727.05. UBS Securities LLC ("UBS"), which is not a party to this action, and which is being sued separately, committed $166,866,749.19 under the

Investment Agreement. Thus, the total commitment under the Investment Agreement, including the commitments of the Investors and UBS, is $2,550,009,476.24.

22. Defendant Appaloosa is a limited partnership organized under the laws of the State of Delaware with an office located at 26 Main Street, Chatham, New Jersey. Appaloosa is a signatory to a Commitment Letter Agreement with Delphi and ADAH, dated December 10, 2007 (the "Appaloosa Commitment Letter Agreement"). The amount of Appaloosa's commitment under the Appaloosa Commitment Letter Agreement is $1,076,394,180.91 subject to escalation to a maximum of $2,550,009,476.24, if Merrill, UBS, Harbinger Del-Auto, Goldman, and/or Pardus DPH Holding terminates the Investment Agreement as to itself or themselves in accordance with the terms of that agreement.

23. Defendant Harbinger is a company organized under the laws of the Cayman Islands with an office located at 555 Madison Avenue, New York, New York. Harbinger is a signatory to a Commitment Letter Agreement with Delphi and Harbinger Del-Auto dated December 10, 2007 (the "Harbinger Commitment Letter Agreement"). The amount of Harbinger's commitment under the Harbinger Commitment Letter Agreement is $397,225,891.24.

24. Defendant Pardus is a limited partnership organized under the laws of the Cayman Islands with an office located at 590 Madison Avenue, New York, New York. Pardus is a signatory to a Commitment Letter Agreement with Delphi and Pardus DPH Holding dated December 10, 2007 (the "Pardus Commitment Letter Agreement"). The amount of Pardus' commitment under the Pardus Commitment Letter Agreement is $342,655,959.96.

## FACTUAL ALLEGATIONS

### *Delphi's Early Years and Bankruptcy Filing*

25.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors, and separated from GM in or about January 1999.  Delphi has evolved from a North-American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although General Motors remains Delphi's single largest customer, Delphi generates more than half of its revenue from non-GM sources.

26.     In the first two years following Delphi's separation from General Motors, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In 2004, the last full year prior to the filing of these Chapter 11 cases, Delphi reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.

27.     Delphi believes that its financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Company from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs; (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of General Motors' annual U.S. production and related pricing pressures; and (c) increasing commodity prices.

28.     In order to address these issues, on October 8, 2005 (the "Petition Date"), Delphi and 38 of its U.S. subsidiaries filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")

for reorganization relief under Chapter 11 of the United States Bankruptcy Code. On

October 14, 2005, three additional U.S. Delphi affiliates filed voluntary petitions. As of

the Petition Date, Delphi ranked as the fifth largest public company business

reorganization in terms of revenues and the thirteenth largest public company business

reorganization in terms of assets. Since the Petition Date, Delphi and its U.S. subsidiaries

have operated its business subject to the restrictions imposed by the Bankruptcy Code.

Until defendants refused to fund their commitments on April 4, 2008, Delphi expected

that the consummation of the Plan and the emergence from chapter 11 on that date would

hasten Delphi's return to economic viability and health.

**The Plan of Reorganization**

29.     Almost two years before the Plan was confirmed, Delphi outlined

the key tenets of a transformation plan that Delphi believed would enable a return to

stable, profitable business operations. The Transformation Plan covered five (5) key

areas and set goals within those areas:

Labor.  Modify Debtors' labor agreements to create a competitive arena in

which to conduct business.

General Motors.  Conclude negotiations with General Motors to finalize

General Motors' financial support for certain of the Debtors' legacy and labor costs and

to ascertain General Motors' business commitment to the Company.

Product Portfolio and Manufacturing Footprint.  Streamline Debtors'

product portfolio to capitalize on world-class technology and market strengths and make

the necessary manufacturing alignment with its new focus.

600950.13                                    10

<u>Cost Structure</u>.  Transform Delphi's salaried workforce and reduce general and administrative expenses to ensure that Delphi's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

<u>Pension</u>.  Devise a workable solution to Delphi's pension funding situation.

30.    The effort and cooperation required of multiple disparate parties to make progress toward those goals has been tremendous, and essential to the formulation of a plan of reorganization.  During the course of these Chapter 11 cases, there has been significant progress by Debtors toward achieving the objectives of their Transformation Plan.  <u>First</u>, Delphi negotiated amended collective bargaining agreements with its labor unions that will enable Debtors to be more competitive in their U.S. operations.  <u>Second</u>, Delphi entered into comprehensive settlement and restructuring agreements with General Motors – specifically, on September 6, 2007, a Global Settlement Agreement and a Master Restructuring Agreement, both of which were later approved by the Bankruptcy Court as part of the plan confirmation process.  These agreements were intended to resolve all major pre-petition disputes between Delphi and General Motors, and were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  <u>Third</u>, with respect to its product portfolio and manufacturing facility realignment, Debtors made substantial progress in identifying and beginning to divest or wind down those facilities and business lines that are not within Delphi's future plans.  <u>Fourth</u>, Delphi is implementing important cost savings in its organizational cost structure and rationalization of its salaried workforce to competitive levels that will allow it to emerge from Chapter 11 much leaner and in a better competitive position.  <u>Fifth</u>, Delphi received favorable pension funding

waivers from the IRS which, combined with the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l) and Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"), and adequate debt financing and equity infusions, will allow Delphi to fund its pension plans after emergence from Chapter 11.

31.     In the early stages of these Chapter 11 cases, Appaloosa pushed, with the grace and diplomacy of a battering ram, to play a central role in the reorganization of the Debtors.

32.     In the course of these Chapter 11 proceedings, Appaloosa acquired substantial Delphi equity and debt in several places in Delphi's capital structure, and Appaloosa actively campaigned and litigated for the appointment of an Equity Committee, on the basis of its contention that Delphi's equity had significant value.

33.     Although Appaloosa did not obtain a place for itself on the Equity Committee, Appaloosa ultimately succeeded in its quest for a prominent role in Delphi's restructuring.  During 2006, Delphi, and also the Statutory Committees and General Motors, interviewed potential plan investors.  The competition was intense, but Appaloosa, together with Cerberus Capital Management L.P. ("Cerberus"), was the winner.  The first version of the Investment Agreement was signed in December 2006; by mid-2007, however, Cerberus was engaged in the acquisition of what is now Chrysler LLC and the completion of its acquisition of 50% of General Motors Acceptance Corporation and decided not to invest in Delphi.

34.     In August 2007, a second version of the Investment Agreement (sometimes referred to as the July EPCA) was executed, with Appaloosa as the sole lead plan investor.

35.     This Court has explained the central importance of the Investment Agreement in Delphi's reorganization effort:  "The building block or basis for that plan or a critical building block or basis for that plan was the July EPCA  in that it provided for, among other things, an aggregate potential cash investment of 2.55 billion dollars by a group of plan investors in return for a stake in the debtors' reorganized equity." (Transcript, December 7, 2007, at p. 14.)

36.     At a hearing on November 16, 2007, this Court reviewed the history concerning the Investment Agreement and explained that the central role achieved by Appaloosa was the result of Delphi's trust, and the Court's trust, that the Appaloosa group would honor its commitments:

> "You may recall that there was competition for the plan investment opportunity . . .and I ruled in favor of this investor group [i.e., Appaloosa, et al.] not just because they were the highest bid, because they weren't, but because they were the best bid, because they had done their due diligence, *because they were presented to me, and I believed it*, that two of the nation's biggest investment banks, including Goldman Sachs, and the large hedge funds that had also their own reputational interests, *would stick by this debtor and their fundamental economic commitments*, unlike the competitive -- the competitor investor who had not done due diligence originally, when this was first negotiated…."

(Nov. 16, 2007 Tr. at 22, emphasis added.)

37.     The Investment Agreement is thus a crucial and irreplaceable component of the agreements and arrangements embodied in the Plan and is necessary

for the successful consummation of the Plan.  The Bankruptcy Court approved Delphi's entry into the final form of Investment Agreement, as amended, in a ruling from the bench on December 7, 2007 and a written order dated December 10, 2007.

38.     The Plan confirmed by the Bankruptcy Court on January 25, 2008 was the culmination of all the settlements that Debtors reached with General Motors, with Debtors' labor unions and with other critical stakeholders in the reorganization cases, as well as all the other agreements Delphi negotiated, including the Investment Agreement, to obtain the necessary financing to fund the Plan and emerge from Chapter 11 as a viable business.

**The Investment Agreement**

39.     The Investment Agreement, which is incorporated in the Plan (s*ee* Article 1, ¶ F; Exhibit 7.11), sets forth the terms upon which the Investors (plus UBS) commit to purchase (i) $175 million of common stock in the reorganized Delphi (the "Direct Subscription Shares"), (ii) $800 million of preferred shares in the reorganized Delphi (the "Preferred Shares") and (iii) any unsubscribed shares of common stock (the "Backstop Commitment") up to $1.575 billion in connection with a certain rights offering (the "Rights Offering").

40.     The Rights Offering contemplated by the Investment Agreement provides for Delphi to distribute, at no charge, to each general unsecured claim holder (an "Eligible Holder") certain rights to acquire new common stock in reorganized Delphi. The "rights" would permit the Eligible Holders to purchase their pro rata share of a set number of shares (41,026,309) at a set purchase price ($38.39 per share).  To the extent that any of these shares are not purchased by Eligible Holders, the Investors and UBS,

through the Backstop Commitment, agree to purchase such shares, resulting in a

commitment of approximately $1.575 billion in respect of such shares. The Rights

Offering raised approximately $20 million as of April 4, 2008, so the Backstop

Commitment as of that date was approximately $1.555 billion.

   41. Accordingly, after taking into account the proceeds of the Rights

Offering, the total commitment of the Investors (and UBS), including the Backstop

Commitment and the commitments to purchase Direct Subscription Shares and the

Preferred Shares, amounts to $2.53 billion as of April 4, 2008.

   42. In consideration of the Investors' commitment, the Investment

Agreement obligates Delphi to pay fees to the Investors in the amount of approximately

$60 million. Such fees are comprised of a "Preferred Commitment Fee," a fee regarding

the Direct Subscription Shares and the Backstop Commitment, and a fee to ADAH for

arranging the transactions contemplated by the Investment Agreement. In addition,

Delphi agrees to pay certain transaction expenses of the Investors.

   43. At the time Delphi entered into the Investment Agreement, it

believed that these fees demanded by the Investors, although considerable, were

appropriate given the size and crucial importance of the equity investment to which the

Investors were committing. In fact, Delphi represented to the Bankruptcy Court that

these fees represent a small fraction of the investment that the Investors would make to

acquire the various securities to be issued by reorganized Delphi.

   44. The Investment Agreement includes each Investor's representation

that the Commitment Letter Agreement of its parent constitutes "valid and binding

obligations of the parties thereto enforceable in accordance with its terms subject to . . .

general equitable principles." Investment Agreement ¶ 4(o). In the proceedings leading

to the Bankruptcy Court approval of the Investment Agreement, Appaloosa represented

to Delphi and the Court that it had agreed to commit a minimum of approximately $1.1

billion of its own capital.

45.     The Investment Agreement obligates each Investor to "use its

reasonable best efforts to take all actions, and do all things, reasonably necessary, proper

or advisable on its part under this Agreement and applicable laws to cooperate with the

Company and to consummate and make effective the transactions contemplated by this

Agreement, the Preferred Term Sheet, the GM Settlement, and the Plan." Investment

Agreement ¶ 6(b).

46.     In section 12 of the Investment Agreement, the parties agree that

Delphi would have the right to terminate the Investment Agreement if Delphi's Board of

Directors determines that their fiduciary duties require them to pursue an alternative

transaction. In that event, the Investment Agreement provides for an agreed-upon fee to

be paid by Delphi to the Investors. The Investment Agreement, however, does not

provide a similar termination right for the Investors.

47.     Appaloosa has nonetheless taken the position that the Investment

Agreement – for which it received from Delphi the lion's share of commitment fees in

excess of $60 million and reimbursement of transaction expenses in the tens of million of

dollars – essentially grants it and the other defendants and UBS an option to fulfill their

commitments or not, in their sole discretion, and that Delphi's sole remedy for a wrongful

termination is to assert a claim for breach (if the breach is willful) and recover whatever

damages are proven up to a cap of $250 million.

48.     In fact, the Investment Agreement does not contain such a limitation on the remedies available to Delphi.  For example, section 18 of the Investment Agreement provides that "[t]he rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights and remedies which any party otherwise may have in law or in equity."  (Investment Agreement ¶ 18.)  Moreover, the Investment Agreement does not contain any limitation on equitable remedies available to Delphi, nor does it purport to limit the power of the Bankruptcy Court to award equitable relief such as specific performance in appropriate circumstances.

### The Commitment Letter Agreements

49.     In connection with the Investment Agreement, three of the Investors – ADAH, Harbinger Del-Auto, and Pardus DPH Holding – entered into commitment letter agreements, dated December 10, 2007, with their parent entities, Appaloosa, Harbinger, and Pardus, respectively.  Delphi is also a party to each of these Commitment Letter Agreements.  The Commitment Letter Agreements set forth the agreement of the Commitment Parties to provide the funds necessary for their affiliated Investors to fulfill their obligations under the Investment Agreement.

50.     In the Appaloosa Commitment Letter Agreement, Appaloosa commits "on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the 'Funds') to [ADAH] in an amount up to $1,076,394,180.91," subject to the terms and conditions set forth in the letter.  The Appaloosa Commitment Letter Agreement further provides that Appaloosa's financial commitment would increase by amounts totaling as much as $1.473 billion in the event of Limited Termination(s) by the other Investors under the Investment

Agreement, thus making Appaloosa's maximum financial commitment approximately $2.5 billion.  The Appaloosa Commitment Letter provides that the Funds are to be used, *inter alia*, to provide the financing for ADAH to fulfill its commitment to purchase equity interests in reorganized Delphi and to satisfy its other obligations under the Investment Agreement.

51.     In the Harbinger Commitment Letter Agreement, Harbinger commits "on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the 'Funds') to [Harbinger Del-Auto] in an amount up to $397,225,891.24," subject to the terms and conditions set forth in the Commitment Letter Agreement.

52.     In the Pardus Commitment Letter Agreements, Pardus commits "to provide or cause to be provided funds (the 'Funds') to [Pardus DPH Holding] in an amount up to $342,655,959.96," subject to the terms and conditions set forth in the Commitment Letter Agreement.

53.     Each of the Harbinger and Pardus Commitment Letter Agreements, like the Appaloosa Commitment Letter Agreement, provides that the Commitment Party's "Funds" are to be used to provide the financing for its affiliated Investor to fulfill its commitment to purchase the equity interests in reorganized Delphi and satisfy its other obligations under the Investment Agreement.

54.     In the Commitment Letter Agreements, all the Commitment Parties represent that they have "and will have on the closing date, available funding necessary to provide the Funds in accordance with this letter agreement."

55.     Each of the Commitment Parties also represents that its respective Commitment Letter Agreement "has been duly authorized and validly executed and delivered and constitutes its valid and binding obligation, enforceable against it in accordance with its terms."

56.     All the Commitment Letter Agreements became effective upon their execution by the parties and expire "on the earliest to occur of (i) the closing of the transaction contemplated by the [Investment] Agreement, and (ii) termination of the [Investment] Agreement in accordance with its terms."  To date, none of the Commitment Letter Agreements has expired since there has not been a closing or a termination of the Investment Agreement in accordance with its terms.

57.     As defendants well know, the Investment Agreement and Commitment Letter Agreements have been recognized by the Court and the parties as forming the foundation for, and being a crucial component of, the Plan (along with the other inter-related agreements, settlements and commitments embodied in the Plan).

58.     The Commitment Letter Agreements, like the Investment Agreement, do not expressly mention or preclude the equitable remedy of specific performance.  In fact, the only provision in the Commitment Letter Agreements reflecting a limitation on equitable remedies applies to third parties, not to Delphi, *i.e.*, the provision that "nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company."

59.     Accordingly, the Commitment Letter Agreements preserve Delphi's equitable rights, including the right to seek and obtain a decree of specific

performance if a legal remedy is unavailable or inadequate in case the Commitment

Parties fail to honor their commitments.

### Appaloosa's Repeated Assurances to Delphi and the Court

60.     In several days of hearings before the Bankruptcy Court

concerning the Investment Agreement – including hearings in July 2007 and two days of

hearings in December 2007 (when the Bankruptcy court approved the current form of the

Investment Agreement and the Disclosure Statement) – neither Appaloosa nor ADAH or

any other Investors or Commitment Parties suggested to the Court that their

commitments, including the express commitment of Appaloosa to fund up to $1.076

billion or more, could not be enforced by the Court even if Delphi complied with all the

conditions and covenants applicable to it.

61.     On the contrary, all the statements of the parties and rulings of the

Court reflected the understanding that the commitments of the Investors and the

Commitment Parties were binding in accordance with their terms and would be funded to

provide the equity financing necessary for Delphi's emergence from Chapter 11.  *See*, *for*

*example*, Exhibit 203 (Declaration of David Tepper, under penalty of perjury, November

27, 2007) introduced into evidence at the hearing before the Bankruptcy Court on

December 6, 2007, in which Mr. Tepper states:  Appaloosa "committed a minimum of

$1.1 billion of its own capital."  *See also* Mr. Tepper's testimony at p. 124 of the

transcript of the hearing on December 6, 2007:  "I understand that when I gave my word

to somebody and shake somebody's hand I have a deal, I have a deal.  That's what I

understand."  *See also* the December 7, 2007 hearing transcript (the Court ruling) at p.

39, lines 5-7:  "I don't believe Mr. Tepper was blowing smoke at me yesterday when he

said a handshake is a handshake, a deal is a deal,'' and a few lines later at p. 39 lines 13-

14, "Consequently, I will approve the debtors' entry into the amended EPCA agreement

[i.e., the Investment Agreement]."

62.      In the months leading up to the scheduled closing on April 4, 2008,

both before and after Appaloosa and the other defendants signed the final versions of the

Investment Agreements and Commitment Letter Agreements, the Court repeatedly made

clear to them the importance of the commitments they were making, and Delphi's

reliance thereon.  For example, on November 16, 2007, the Court stated:

> "The premise of the negotiations that this company has
> been undertaking over the past several months, and upon
> which thousands of workers have made enormous personal
> sacrifices was the framework of these agreements [i.e.,
> Investment Agreement and Commitment Letter
> Agreements]…."

(November 16, 2007 Tr. at 23.)

The Court also explained that the whole point of an equity sponsor, such as Appaloosa,

for a plan, is that the sponsor has to honor its commitment and stand by the company:

> "… if the parties don't come to their senses and appreciate
> that as a sponsor of this company they have to stand by the
> company – because otherwise why have a sponsor, why not
> give the equity to those who are in the debt already and in
> the equity already …."

(*Id.*)

63.      Most recently, at the hearing on March 7, 2008, concerning

Delphi's motion pursuant to 11 U.S.C. §1142, the Court referred to the parties'

obligations under the Investment Agreement and stated:

> "As I've said repeatedly during this hearing, those
> obligations include reciprocal, reasonable best efforts
> obligations to take all actions and do all things reasonably

necessary, proper or advisable to cooperate with each other
and *to consummate and make effective the transactions
contemplated by the EPCA [i.e., the Investment Agreement]*
including the financing."

(March 7, 2008 Tr. at 119.)

### The Bankruptcy Court Confirms the Plan

64.     On January 25, 2008, the Bankruptcy Court entered an order

confirming the Plan.  The Plan is based on a series of global settlements, compromises

and agreements that involve nearly every major constituency in the Debtors'

reorganization cases.  The Plan provides, *inter alia*, that, on its effective date, the

reorganized Debtors would receive the proceeds of the equity financing arrangements as

defined in the Plan and the Investment Agreement.

65.     The Plan, including all agreements and documents encompassed

therein, was confirmed with the unqualified support of Appaloosa and the Investors,

among others.  Under the terms of the Investment Agreement, the conditions relating to

the terms of any and all post-confirmation amendments and supplements have been

deemed to be conclusively satisfied.

### Delphi Arranges Its Exit Financing

66.     On November 16, 2007, the Bankruptcy Court entered an order

authorizing Delphi to enter into a "commercially reasonable best efforts" engagement

letter and fee letter with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and

Citigroup Global Markets Inc. (the "Lead Arrangers").  At the time, Delphi anticipated

that its exit financing would consist of: (i) a senior secured first-lien asset-based

revolving credit facility in an aggregate principal amount of $1.6 billion (the "ABL

Facility"); (ii) a senior secured first-lien term facility in an aggregate amount of $3.7

billion (the "First-Lien Loan"); and (iii) a senior secured second-lien term facility in the

amount of $1.5 billion (the "Second-Lien Loan"), of which up to $750 million would be

in the form of a note issued to General Motors in connection with the distributions

contemplated under the Plan.

67.    On January 9, 2008, Delphi announced the commencement of the

syndication of its exit financing package to support the Debtors' planned emergence from

Chapter 11.  Primarily as a result of improved operating performance and lower than

forecast capital expenditures for the 2007 fiscal year, Delphi reduced its planned exit

facilities from the previously announced $6.8 billion to approximately $6.1 billion.

Specifically, Delphi reduced the Second-Lien Loan from $1.5 billion to $825 million, of

which up to $750 million would be in the form of a note issued to General Motors in

connection with the distributions contemplated under the Plan.  At the time of the

financing launch in January, Delphi discussed with the Investors this reduction in the

amount of the financing to be sought, and the Investors gave their approval.

68.    Pursuant to the Plan, the Debtors were to "receive the proceeds of

the Exit Financing Arrangements, in the aggregate amount necessary to implement the

Plan within the terms and conditions previously approved by the Bankruptcy Court as

described in the exit financing engagement letter and term sheet attached [to the Plan] as

Exhibit 7.14, as such term sheet may be amended, modified or supplemented….." (Plan

art. 7.14.)

69.    With respect to exit financing, the Investment Agreement requires

that the amount of the exit financing be "sufficient" to fund the Plan (Investment

Agreement § 9(a)(xix)) and additionally requires that Delphi "demonstrate[], to the

reasonable satisfaction of ADAH, that the pro forma interest (cash or noncash) expense

for the Company during 2008 on the Company's indebtedness will not exceed $585

million…." (Investment Agreement § 9(a)(xx)).

70.     During the syndication process, it became apparent to Delphi and

the Lead Arrangers that the likelihood of consummation of the syndication in its

proposed amount, structure, and terms would be improved by General Motors'

participation, pursuant to which General Motors would purchase up to $2 billion of the

First-Lien Loan and, if necessary, all of the $825 million Second-Lien Loan without any

original issue discount ("OID") and at an interest rate calculated to ensure compliance

with the Investment Agreement interest expense limitation.  It was anticipated that the

aggregate effect of General Motors' exit financing participation would result in General

Motors holding an up-to-$2 billion first-lien note and an up-to $825 million second-lien

note, and receiving at least $175 million in cash. General Motors' position in the First-

Lien Loan would be junior to that of other lenders and would be subject to voting

restrictions during any time period in which it holds $1 billion or more in first-lien

financing.  Delphi and the Lead Arrangers reasonably determined that the increased

General Motors' participation would allow the Debtors to obtain the remaining exit

financing required to consummate the Plan.

### *Appaloosa's Clandestine Efforts to Avoid Its Obligations*

71.     Even before the Plan was confirmed on January 25, 2008,

Appaloosa, unbeknownst to Delphi, had started engaging in efforts to avoid its

obligations and undermine the consummation of the Plan.

72.    In or about November and December 2007, prior to the date the Court approved the Investment Agreement and the Commitment Letter Agreements, Appaloosa discussed with other investors the concern that the fulfillment of commitments to purchase equity securities pursuant to the Investment Agreement would be a poor investment.  These communications occurred among Appaloosa and certain other investors who had agreed with the Investors and UBS to participate in the purchase of equity securities under the Investment Agreement.

73.    The other investors referred to in the preceding paragraph were among a group of about a dozen investors (referred to as the "Additional Investors") who had entered into an agreement with the Investors and UBS dated July 20, 2007 titled Additional Investors Agreement (to which Delphi was not a signatory).  The Additional Investors Agreement sets forth the terms on which the Additional Investors agree to participate in the equity purchase obligations of the Investors and UBS (referred to as the Initial Investors in such agreement).  Under the terms of the Additional Investor Agreement, the obligations of the Additional Investors would continue, and did continue, under the amended and final form of the Investment Agreement executed in December 2007.  The decision to enter into the amended Investment Agreement belonged to the Initial Investors, and was not subject to approval by the Additional Investors.

74.    Prior to December 10, 2007, certain of the Additional Investors urged Appaloosa not to enter into the amended and final form of the Investment Agreement because they believed that the purchase of equity securities under the Investment Agreement would be a poor investment.  Delphi alleges and believes,

although Delphi was never privy to any such communications and was unaware of them until much later, that Appaloosa agreed with the views of the Additional Investors.

75.     Delphi alleges and believes that Appaloosa agreed to the final form of Investment Agreement and Commitment Letter Agreements, in order to obtain substantial commitment fees being paid by Delphi, and with the intention and plan to avoid its obligations if the equity was out of the money at the time scheduled for closing even if Delphi proved able to fulfill the conditions and covenants applicable to it.

76.     On or about January 18, 2008, Appaloosa and certain of the Additional Investors engaged in communications concerning a plan to avoid closing under the Investment Agreement, and to pay Delphi what they characterized as a reverse break-up fee of $250 million rather than fulfilling their commitments.  Appaloosa, instead of fulfilling its obligation to use its reasonable best efforts to take all actions and do all things reasonably necessary, proper or advisable to cooperate with Delphi and to consummate the transactions under the Investment Agreement – which would have required Appaloosa to refrain from and/or shut down the planning with these Additional Investors as soon as it began – encouraged such planning, and sought to protect and advance its own financial self-interest in disregard of its commitments and obligations to Delphi.

77.     In connection with the illicit planning referred to in the preceding paragraph, Appaloosa asked the Additional Investors to agree to pay to Appaloosa a pro-rata share of any liability if Appaloosa were to terminate the Investment Agreement.

78.     In addition, on or about March 26, 2008, Delphi was shocked to learn from a credible source that certain of Delphi's committed equity investors had been

trying to avoid their obligations by seeking to persuade exit financing lenders to

withdraw their commitments, in an effort to render Delphi unable to satisfy the financing

condition under the Investment Agreement.  This source advised Delphi, and Delphi

alleges and believes, that the direct communications with exit lenders were engaged in by

certain of the Additional Investors, not by Appaloosa itself, because Appaloosa was too

smart to engage in such conduct directly.  Nonetheless, Appaloosa and the other Initial

Investors – defendants herein – remain legally responsible for the misconduct of the

Additional Investors.  Such misconduct also includes short-selling of Delphi's securities

– which could only have had the purpose or effect of depressing the value of Delphi and

making it only more difficult for Delphi to obtain the exit financing needed for

consummation of the Plan – all in violation of the Investment Agreement.

79.     On or about April 2, 2008, Appaloosa transmitted to the Additional

Investors a proposed form of agreement to amend the Additional Investor Agreement and

provide that certain indemnification obligations, which otherwise would terminate upon

termination of the Investment Agreement, would survive such termination.  Delphi

alleges and believes that the above-described actions and communications were part of a

plan and scheme by Appaloosa to avoid its obligations and prevent a closing under the

Investment Agreement and Commitment Letter Agreements and to have the Additional

Investors share in Appaloosa's liability, and the liability of the other Initial Investors, for

refusing to fund their commitments.

80.     Delphi further alleges and believes that Appaloosa knew the

Investment Agreement did not grant the Investors and UBS the right to terminate as

Appaloosa was planning to do.  Indeed, as early as January 18, 2008, at least one of the

Additional Investors explicitly cautioned that there is no provision in the Investment

Agreement for a reverse break-up fee if the plan investors walk away from their

obligations, and that the investors could be exposed to litigation and a larger charge for

failing to honor their obligations.  Nonetheless, during the period leading up to the

scheduled closing on April 4, 2008, Delphi alleges and believes that Appaloosa's strategy

and goal was to avoid fulfilling its commitments.

81.    Moreover, instead of using its reasonable best efforts to honor its

obligations, as it was contractually obligated to do, Appaloosa tasked its army of lawyers

to comb the Investment Agreement for the purpose of trying to manufacture an excuse

that might justify defendants' refusal to close the transactions contemplated by the

Investment Agreement and the Commitment Letter Agreements that were vital to the

consummation of the Plan.

82.    The hope by defendants that Delphi would fail to fulfill its

obligations with respect to obtaining exit financing were dashed when General Motors

agreed to participate in the loan syndicate.  Indeed, in late February 2008, one of the

Additional Investors expressed the gloomy (to defendants) prognosis:  "If General

Motors takes down the financing, we will not have a choice but to fund."  Nonetheless,

Appaloosa and its lawyers came up with an argument that General Motors' participation

– which in fact benefited all of Delphi's stakeholders and enabled Delphi to achieve the

necessary exit financing on terms more favorable than otherwise contemplated –

somehow violated an unrelated covenant that was intended for an entirely different

purpose.  As alleged herein, that argument has ultimately been shown to be specious.

83.     Thus, at a time when to all outward appearances Appaloosa was fully committed to the consummation of the Plan, just the opposite was true.  Delphi was deceived as a result of its trust in Mr. Tepper and Appaloosa.  Delphi reasonably believed that Appaloosa had the intention to honor its funding commitment – as Mr. Tepper had explicitly stated in open court (*see*, e.g., paragraph 61 above).  During Appaloosa's involvement as lead equity investor for Delphi, tens of millions of dollars were spent developing the Plan, and then taking steps to implement it.  Complex settlements were negotiated and approved by the Bankruptcy Court because Appaloosa conditioned its investment on resolutions with many parties such as General Motors, Delphi's labor unions and the IRS. Changes were made to the Investment Agreement after it had been approved by the Court in August 2007 – over strenuous objections – to improve the economics for Appaloosa.  Contested court hearings were held in December of 2007 and January of 2008 as Delphi fulfilled its obligations to obtain Court approval for the EPCA and the Plan.  Thousands of hours and millions of dollars were spent readying for the exit from chapter 11.  Documents were drafted and redrafted.  The plan and solicitation materials were prepared and sent out.  Filings were made with the SEC.  The rights offering was prepared and completed.  The exit financing was arranged and documented.  Creditors and shareholders read the voluminous plan materials and voted on the Plan.  Only when it was too late did Delphi learn that Appaloosa never intended to fulfill its commitment if the equity investment was under water at the time of closing, and that after the Investment Agreement was signed, Appaloosa and its allies were secretly working behind the scenes to undermine all of the efforts to achieve Plan

consummation that the Debtors and their employees and other stakeholders were trying
so hard to complete in good faith.

***ADAH Objects to the Exit Financing Arrangements***

84.     On February 6, 2008, Delphi, General Motors, ADAH, and their
respective representatives met to discuss the proposal for General Motors' enhanced
participation in the Exit Financing Arrangements (the "Proposal") as summarized in a
draft term sheet.  Subsequently, in a February 13, 2008 letter, counsel for Appaloosa and
ADAH, on behalf of the Investors (other than Goldman), set forth various concerns with
that Proposal.  The February 13 letter also advised that the Investors as defined in the
EPCA (other than Goldman) had entered into a common interest agreement.  In fact, the
parties to the common interest agreement are two of the Investors (Merrill and UBS) plus
Appaloosa, Harbinger and Pardus, i.e., the Commitment Parties acting for their affiliated
shell entities who are among the Investors.  The common interest agreement recites that
the signatories thereto (defined as the "Common Interest Parties") have a common
interest in "potential litigation between the Common Interest Parties, on the one hand,
and Delphi … on the other hand."

85.     Delphi responded to the February 13 letter on February 20, 2008,
explaining why the concerns of the Investors under the EPCA were unfounded and
requesting that such Investors proceed with their reasonable best efforts to take all
actions, and do all things, reasonably necessary, proper, or advisable to cooperate with
the Debtors and to consummate and make effective the transactions contemplated by the
Investment Agreement and the Plan.  In a February 24, 2008 letter, however, counsel for
ADAH asserted that the Proposal was "non-compliant, and inconsistent, with the EPCA."

86.     As a result of the Investors' intransigence concerning the proposed terms of the exit financing, Delphi filed a motion under section 1142 of the Bankruptcy Code.  Although that motion was not granted, the guidance from the Court – that the objection to GM's participation in the exit financing could be addressed if a GM affiliate were substituted for GM – was accepted by Delphi.

**Delphi Performs under the Investment Agreement**

87.     In reliance on the binding commitments of defendants, as set forth in the Investment Agreement and the Commitment Letter Agreements, Delphi proceeded to take all actions necessary to consummate the Plan, with an announced goal of emerging from bankruptcy during the first quarter of 2008.  For example, in order to ensure that the more than $6 billion in exit financing would be available on April 4, 2008, Delphi paid all commitment fees due to the Lead Arrangers ($10 million) plus millions more in expenses, and proceeded with the Rights Offering and complied with all conditions necessary to obtain such financing.  As of April 4, 2008, Delphi fulfilled all applicable conditions and covenants for closing under the Investment Agreement and consummation of the Plan.

**ADAH's Purported Termination of the Investment Agreement**

88.     On April 4, 2008, all the parties (other than defendants and UBS) required for a successful closing under the Plan and emergence from Chapter 11 – including Delphi's exit financing lenders, GM, and the Creditors Committee and Equity Committee – were ready, willing and able to move forward.  All actions necessary to consummate the Plan were prepared to be taken – other than the concurrent closing and funding of the Investment Agreement.  Thus, the closing would have been consummated,

and Delphi would have successfully emerged from Chapter 11, but for the wrongful

termination by ADAH and the refusal of the Investors and the Commitment Parties to

honor their commitments.

89.   Just hours before the scheduled closing, Delphi received a letter

from ADAH stating that "this letter constitutes a notice of immediate termination of the

Agreement…."  In its letter, ADAH asserted a right to terminate under sections 12(d)(v),

12(d)(vi)(A) and 12(d)(vi)(B) of the Investment Agreement.

90.   In fact, because Delphi had complied with all conditions and

requirements under the Investment Agreement, ADAH had no right to terminate, and

ADAH's April 4 notice constituted a wrongful termination of the Investment Agreement.

91.   There are many deficiencies in the ADAH notice of April 4.  For

example, section 12(d)(vi)(B) of the Investment Agreement, cited by ADAH, concerns

termination if Delphi enters into an "Alternate Transaction Agreement."  In fact, although

ADAH asserted that it was terminating under 12(d)(vi)(B) and that Delphi was obligated

to pay an Alternate Transaction Fee of $82,500,000, Delphi had not entered into an

Alternate Transaction Agreement.  As defined in the Investment Agreement, an Alternate

Transaction Agreement is an agreement that relates to an Alternate Transaction, which

means any plan, proposal, offer or transaction that is inconsistent with the Investment

Agreement, the Preferred Term Sheet, the GM Settlement, or the Plan.  Delphi did not

enter in any such agreement.  On the contrary, Delphi did everything that was required of

it in order to consummate the Agreement, the Preferred Term Sheet, the GM Settlement

and the Plan.

92.     ADAH also asserted a right of termination under section
12(d)(vi)(A) of the Investment Agreement which provides that ADAH has a right of
termination if there has been a "Change of Recommendation," as defined in the
Agreement.  A Change of Recommendation means that Delphi or its Board of Directors
or any committee thereof shall have (i) withheld, withdrawn, qualified or modified (or
resolved to do any of those things), in a manner adverse to the Investors, its approval or
recommendation of the Agreement, the Preferred Term Sheet, the GM Settlement or the
Plan or the Transactions contemplated hereby or thereby, or (ii) approved or
recommended, or proposed to approve or recommend, any Alternate Transaction.  In fact,
Delphi and its Board and the committees thereof have done everything appropriate to
consummate the Agreement, the Preferred Term Sheet, the GM Settlement and the Plan,
and there has been no Change of Recommendation.

93.     With respect to section 12(d)(v) of the Investment Agreement,
which provides that ADAH may terminate if the Company has breached any provision of
the Investment Agreement, which breach would cause the failure of any condition set
forth in section 9(a)(xvi) or (xvii) to be satisfied, Delphi committed no such breach.
Sections 9(a)(xvi) and (xvii) set forth the closing conditions that all the representations
and warranties of Delphi contained in the Investment Agreement shall be true and correct
and that Delphi shall have performed and complied with all of its covenants.  In fact, as
of April 4, all of the representations and warranties of Delphi were true and correct and
Delphi had performed and complied with all of its covenants and agreements.

94.     On April 5, 2008, ADAH delivered to Delphi a second letter,
described as "a supplement to the April 4 Termination Notice," stating "this letter

constitutes a notice of an additional ground for termination" of the Investment

Agreement.  The April 5 letter cited Section 12(d)(iii) of the Investment Agreement based

on the Plan not having become effective on or before the deadline of April 4, 2008.

Having already derailed the closing by its wrongful termination the previous day,

however, ADAH could not profit or benefit from its own wrongful refusal to close on

April 4, 2008.  The second letter thus had no legal or practical significance.

95.    Defendants' refusal to proceed to closing constitutes a willful

breach or, in the alternative, a breach of their obligations under the Investment

Agreement.  Similarly, Appaloosa, Harbinger and Pardus have breached, or willfully

breached, their obligations under the Commitment Letter Agreements.

96.    Even after ADAH sent its notices of termination of the Investment

Agreement, Appaloosa sought to maintain control over Delphi's prospects and impede

Delphi's ability to pursue an alternative transaction with other equity investors.

Specifically, on April 7, 2008, ADAH wrote to the Additional Investors and advised –

falsely – that the Initial Investors have submitted to Delphi "a substantive proposal for, or

are actively negotiating with the Company, a transaction similar to the transactions

contemplated by the EPCA…."  The effect of such notice was to prevent the Additional

Investors from independently discussing with Delphi an alternative transaction for equity

financing.  Fortunately, Delphi learned of this improper notice from one of the Additional

Investors who received it, and demanded that Appaloosa cease its interference with

Delphi's reorganization efforts.

97.    As things now stand, unless a decree of specific performance is

issued by the Court as requested herein, there is no possibility that the confirmed Plan can

be consummated, and Delphi, which on April 4 was literally on the brink of emerging from Chapter 11, will have to develop a modified plan with the resultant burdens, costs and delays for all stakeholders that such process entails.  Monetary damages could not adequately compensate Delphi for such harm, and would not protect Delphi's employees and other stakeholders from the consequences of defendants' wrongful conduct.

***Delphi's Exit Financing Complied with the Investment Agreement***

98.     Contrary to the Plan Investors' contentions, as of April 4, 2008, Delphi's exit financing arrangements satisfied all requirements of the Investment Agreement.

99.     The Investment Agreement does not specify the terms of Delphi's exit financing.  Rather, that Agreement provides two principal closing conditions concerning Delphi's exit financing.  First, the Investment Agreement requires that that amount of the exit financing be "sufficient" to fund the Plan.   (Investment Agreement § 9(a)(xix).)  Second, the Investment Agreement requires that Delphi's aggregate interest expense for 2008 not exceed $585 million.  (*Id.* § 9(a) (xx).)

100.     Delphi's exit financing, as available on April 4, satisfied both conditions.

101.     Nonetheless, in its April 4 termination notice, ADAH contended that Delphi's exit financing arrangements breached certain representations, warranties, or covenants contained in the Investment Agreement.  First, the Investors contend that Section 5(p) of the Investment Agreement prohibits GM from participating in Delphi's exit financing because such participation would constitute an "agreement with GM . . . outside the ordinary course of business."  The Bankruptcy Court, however, in the hearing

on March 7, 2008, addressed this contention and provided guidance to Delphi and the

Plan Investors, *i.e.*, that the proposed exit financing would *not* violate Paragraph 5(p) of

the Investment Agreement so long as the financing was entered into between Delphi and

an affiliate or subsidiary of GM, rather than GM itself.  Informed by that guidance,

Delphi arranged its exit financing in a manner that would comply with the Court's

direction.

102.    ADAH also contended in its April 4 notice that Delphi's exit

financing breached Paragraph 5(t) of the Investment Agreement.  In order to justify their

decision not to close, the Investors took the position that the Investment Agreement's

definition of "debt financing" required Delphi to obtain financing on the <u>exact</u> financing

terms described in the "best efforts" financing letter provided by Delphi's lead arrangers.

However, subject to the specific covenants concerning sufficiency to fund the Plan and

cap on first-year interest, the Investors did not retain the right to reject the exit financing

if the "best efforts" resulted in terms that were different from those expressly indicated in

the financing letter.

103.    Because Delphi satisfied its obligations under Paragraph 5(t), that

covenant was satisfied.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(against the Investors for Breach of Contract:  the Investment Agreement)**

104.    Delphi repeats and re-alleges the allegations contained in

paragraphs 1 through 103 above as if fully set forth in this paragraph.

105.    Delphi and the Investors are parties to the Investment Agreement,

which is a valid and binding contract.

106.    The Investment Agreement sets forth the obligation of the Investors and UBS to invest up to $2.55 billion in reorganized Delphi.

107.    Delphi substantially performed under the Investment Agreement.

108.    On April 4, 2008, Delphi was ready, willing, and able to fulfill its obligations under the Investment Agreement and had fulfilled all of its covenants and satisfied all of the conditions under the Investment Agreement.  Delphi alleges in the alternative that as to each condition, it was either satisfied by Delphi or waived by defendants and/or defendants by their conduct are estopped from asserting any non-compliance.

109.    The Investors breached the Investment Agreement, as well as the implied covenant of good faith and fair dealing inherent in the Investment Agreement, by refusing to comply with their obligations under the Investment Agreement, and by wrongfully and without cause terminating the Investment Agreement.  The Investors also breached their contractual obligations and their duty of good faith by failing to use their reasonable best efforts to consummate the transactions under the Investment Agreement, and by offering pretextual reasons for their refusal to fulfill their obligations.

110.    Delphi has no adequate remedy at law.

111.    Delphi is entitled to a decree of specific performance ordering the Investors to perform their obligations under the terms of the Investment Agreement, including, without limitation, the obligation of the Investors to purchase $164.8 million (a total of $175 million with UBS) of common stock in the reorganized Delphi; to purchase $735 million of preferred shares (a total of $800 million with UBS)  in the reorganized Delphi; and to purchase all unsubscribed shares of common stock in connection with the

Rights Offering, up to a total investment of $2.383 billion (or a total of $2.55 billion with

UBS).  In addition, Delphi is entitled to damages in an amount to be determined at trial to

compensate for harm incurred as a result of costs and losses due to the delay in

defendants' performance from April 4, 2008 to the date performance occurs pursuant to a

judgment of the Court.

112.    In the alternative, Delphi is entitled to damages from the Investors

in an amount to be determined at trial.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(against the Commitment Parties for Breach of Contract:
the Commitment Letter Agreements)**

113.    Delphi repeats and re-alleges the allegations set forth in paragraphs

1 through 112 above as if fully set forth in this paragraph.

114.    Delphi and the Commitment Parties are parties to the Commitment

Letter Agreements, which are valid and binding contracts.

115.    The Commitment Letter Agreements set forth the obligation of the

Commitment Parties to fund the obligations of the Investors under the Investment

Agreement.

116.    Delphi substantially performed any obligations it has under the

Commitment Letter Agreements.

117.    On April 4, 2008, Delphi was ready, willing, and able to fulfill its

obligations under the Investment Agreement and the Commitment Letter Agreements,

and had fulfilled all applicable conditions and covenants under the Investment Agreement

and the Commitment Letter Agreements.  Delphi alleges in the alternative that as to each

condition, it was either satisfied by Delphi or waived by defendants and/or defendants by their conduct are estopped from asserting any non-compliance.

118.    The Commitment Parties breached the Commitment Letter Agreements, as well as the implied covenant of good faith and fair dealing inherent in the Commitment Letter Agreements, by refusing to fund the obligations of the applicable Investors under the Investment Agreement.

119.    Delphi has no adequate remedy at law.

120.    Delphi is entitled to a decree of specific performance ordering the Commitment Parties to perform their obligations under the terms of the Commitment Letter Agreements, including the obligation to fund the obligations of the applicable Investors under the Investment Agreement.  If, in the alternative, the Court concludes that the Commitment Letter Agreements are not subject to specific enforcement, the Court should pierce the corporate veil of the shell companies that are signatories to the Investment Agreement and impose liability upon their parent entities, who are signatories to the Commitment Letter Agreements, to fund the obligations of their affiliates under the Investment Agreement.  Such affiliates are shell corporations entirely dominated and controlled by their parent entities, and existing solely to serve the interests of their parents.  The parent entities caused their affiliates to breach their obligations under the Investment Agreement, and the parent entities controlled in all respects the negotiation of and performance (or lack thereof) under the Investment Agreement. Under the circumstances alleged herein, the corporate veil should be pierced to prevent fraud or to achieve equity.

121.    In the alternative, Delphi is entitled to damages from Appaloosa and the other Commitment Parties in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (against All Defendants under 11 U.S.C. § 1142)

122.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 121 above as if fully set forth in this paragraph.

123.    The Bankruptcy Code empowers the Bankruptcy Court to direct any necessary party to perform any act that is necessary for the consummation of a plan. 11 U.S.C. § 1142(b).

124.    The Plan would have been consummated on April 4, 2008, but for the wrongful conduct of the defendants.

125.    It is necessary for the consummation of the Plan for the Investors and the Commitment Parties to comply with their obligations under the Plan, the Investment Agreement, and the Commitment Letter Agreements.

126.    Absent an order of the Bankruptcy Court compelling their performance, the Investors and Commitment Parties will continue to refuse to fulfill their obligations and to perform the acts necessary to consummate the Plan.

127.    The Bankruptcy Court should exercise its equitable authority under 11 U.S.C. § 1142 to order defendants to comply with their obligations under the Plan, the Investment Agreement and the Commitment Letter Agreements.

## FOURTH CLAIM FOR RELIEF
### (against Appaloosa for Fraud)

128.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 127 as if fully act forth in this paragraph.

129.    By virtue of its role as Plan sponsor and its relationship of trust with Delphi, Appaloosa had a duty not to omit to disclose to Delphi, in the period from on or about December 1, 2007 to April 4, 2008, that Appaloosa, in concert with other Plan investors, had decided to seek to avoid their commitments rather than fulfill such commitments that were necessary for the consummation of the Plan.

130.    During the critical period from on or about December 1, 2007 to April 4, 2008, Appaloosa deliberately, intentionally and knowingly concealed from Delphi that Appaloosa and others among the Investors and Additional Investors had decided to pursue a plan of avoiding rather than fulfilling their investment obligations and commitments with respect to Delphi's equity financing necessary for consummation of the Plan.  Appaloosa knew that Delphi, in litigating for approval of the amended EPCA and the confirmation of the Plan, and engaging in extensive efforts to achieve consummation of the Plan, was acting on incomplete, inaccurate, and mistaken information regarding Appaloosa's actions and intentions.  Indeed, as alleged herein, Appaloosa had repeatedly represented to Delphi that it was committed to providing the equity financing necessary for consummation of the Plan.

131.    Delphi reasonably relied on Appaloosa's repeated assurances and commitments, and was deceived by Appaloosa's concealment as alleged herein of its plans, decisions and actions to undermine the Investment Agreement and the Plan and the equity financing needed for consummation of the Plan, and thus refrained from pursuing alternatives, to its own detriment and the detriment of all its stakeholders.  Delphi's reliance was justified as Delphi had no other means of ascertaining the facts concerning Appaloosa's decisions and actions to avoid its commitments.

132.     Delphi would not have entered into, and litigated for approval of the amended EPCA in December 2007 and the confirmation of the Plan in January 2008, nor would Delphi have undertaken all of the other tremendous efforts and costs as alleged herein to achieve consummation of the Plan, if Delphi had known the truth concerning Appaloosa's intentions and plans to avoid fulfillment of its commitments and obligations. If Delphi had known the truth about Appaloosa's plans and actions to avoid its commitment, Delphi would have pursued legal relief and alternative business plans well before April 4, 2008.

133.     Appaloosa had a duty to disclose the truth to Delphi because (i) Appaloosa had repeatedly and publicly declared its commitment to provide the equity financing that was essential for consummation of the Plan, (ii) Appaloosa had particular and superior knowledge not available to Delphi by virtue of Appaloosa's leadership role as Plan investor and sponsor, and (iii) Appaloosa had a special relationship with Delphi such that disclosure required.

134.     By virtue of the foregoing, Delphi is entitled to damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (against All Defendants for Equitable Subordination and Disallowance)

135.     Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 134 above as if fully set forth in this paragraph.

136.     Because the Investors and the Commitment Parties were selected as sponsors of the Plan and undertook both fiduciary and contractual duties in connection

with that role, the Investors and Commitment Parties are insiders and/or fiduciaries of Delphi and the other Debtors.

137.    The Investors and Commitment Parties have acted inequitably and breached their duties to the Debtors, and caused substantial harm to the Debtors, their employees, creditors and other stakeholders.  Therefore, any claim or interest of the defendants in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent of the law.

138.    Defendants' conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed the Debtors, their employees, creditors and other stakeholders.  Any claim or interest of the defendants in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Delphi respectfully requests that this Bankruptcy Court enter judgment in its favor and grant the following relief:

(1)    ordering the Investors to fully comply with their obligations under the Investment Agreement and the Plan, including their obligation to invest up to $2.383 billion (or $2.55 billion including the UBS investment) in reorganized Delphi;

(2)    ordering the Commitment Parties to fully comply with their obligations under the Commitment Letter Agreements and the Plan, including their obligation to provide the funds necessary for the Investors to make the investments committed under the Investment Agreement;

(3)     in the alternative, ordering the Investors and the Commitment

Parties to pay damages in an amount to be determined at trial;

(4)     equitably subordinating and/or disallowing defendants' claims and

interests in respect of the Debtors' estates;

(5)     awarding Delphi punitive damages, as against Appaloosa, in an

amount to be determined at trial;

(6)     awarding Delphi costs and attorneys' fees; and

(7)     awarding any other and further relief the Court deems just.

Dated:   New York, New York
         May 16, 2008

                              FRIEDMAN KAPLAN SEILER &
                                 ADELMAN LLP


                              /s/ Edward A. Friedman
                              Edward A. Friedman (EF-1995)
                              William P. Weintraub (WW-2897)
                              Andrew W. Schilling (AS-7872)
                              Shira D. Weiner (SW-9219)
                              Danya Shocair Reda (DR-3036)

                              1633 Broadway
                              New York, NY 10019-6708
                              (212) 833-1100
                              *Attorneys for Plaintiff Delphi Corporation*